# Hower v. Rogers

C.P. of Berks County, no. 98-6007.

*Kenneth Millman,* for appellant.

*Edwin L. Stock,* for appellees Ganas and The Reading Hospital and Medical Center.

*John R. Sparks Jr.* and *Karen E. Minehan* for appellees Rogers and Women's Clinic Ltd.

ESHELMAN, *J.,* September 17, 2001—In this medical malpractice action, plaintiff Mary Ann Hower has appealed our order of June 26, 2001, denying her motion to remove nonsuit. This opinion is filed pursuant to Pa.R.A.P. 1925(a).

On or about July 31, 1996, Hower reported to The Reading Hospital and Medical Center for the induction of labor of her sixth child. (N.T. p. 57.) During labor, defendant Robert M. Rogers M.D., the attending obstetrician, informed Hower that her baby was in distress and a C-section was necessary. (N.T. pp. 141-42.) Rogers, assisted by third-year resident defendant Christine L.

Ganas M.D. performed the C-section and delivered a healthy baby boy. (N.T. pp. 67-68, 237.) While closing the fascia layer of Hower's abdomen a portion of the tip of the suturing needle broke off. (N.T. p. 238.) Rogers and Ganas with the aid of nurses searched the operative site with their fingers as well as the table, drapes and floor. (N.T. pp. 226-27.) The needle tip was not found. Ganas recommended that a portable x-ray machine be used in the operating room to attempt to locate the needle tip in Hower's tissue but Rogers refused to authorize its use. (N.T. p. 224.) Both surgeons thought they had seen the needle tip fly off the table. (N.T. p. 226.) Rogers and Ganas then completed suturing Hower's abdominal incision.

On April 7, 1997, Hower visited her family doctor complaining of bladder and kidney infections. (N.T. p. 76.) Consequently, her physician ordered an intravenous pyelogram (IVP), an x-ray which revealed that the broken needle tip from Hower's C-section remained in her abdomen. (N.T. pp. 81-82.) Hower then consulted Dr. Peter Issac, a general surgeon, and requested that he remove the needle tip which he did on May 18, 1997. (N.T. 2/2/00 pp. 32, 34, 40.) Prior to the C-section, Rogers never told Hower that it was possible that a needle would break during the procedure. (N.T. p. 236.) Rogers admitted that the needle tip that broke during the C-section was the same one discovered during the IVP. (N.T. pp. 239-40.)

On May 28, 1998, Hower filed the within cause of action. Trial commenced on March 5, 2001. At the close of Hower's case on March 8, 2001, defendants moved

for a compulsory nonsuit which the court granted. Hower filed a motion to remove nonsuit on March 15, 2001. After all briefs were submitted, the court denied Hower's motion. This appeal followed.

A compulsory nonsuit may be entered only when the plaintiff cannot recover under any view of the evidence, resolving every doubt against its entry and drawing all inferences most favorably to the plaintiff. In the consideration of a nonsuit, all conflicts in the evidence are to be resolved in favor of the plaintiff. *Bowser v. Lee Hospital,* 399 Pa. Super. 332, 582 A.2d 369 (1990).

Hower's first issue on appeal is that the court erred in granting Rogers' motion for nonsuit where she established at trial a prima facie case of medical negligence even though she produced no expert testimony.[1]

To state a cause of action for medical malpractice, a plaintiff must establish that the physician owed a duty to the plaintiff, that the physician breached that duty, that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the plaintiff, and that the damages suffered by the plaintiff were a direct result of that harm. Moreover, the pa-

---

1. In her "statement of matters complained of on appeal" Hower raises 11 issues. However, the court's opinion deals with only those issues discussed in Hower's brief and supplemental brief filed in support of her motion to remove nonsuit. Only issues specifically raised in post-trial motions are preserved for review and, even though an issue is contained in a post-trial motion, the issue is waived for purposes of appellate review unless it is briefed or argued during the post-trial proceedings. *Cucchi v. Rollins Protective Services,* 377 Pa. Super. 9, 546 A.2d 1131 (1988); *Allegheny Housing Authority v. Hibbler,* 748 A.2d 786 (Pa. Commw. 2000).

tient must offer an expert witness who will testify to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered. *Wolloch v. Aiken,* 756 A.2d 5 (Pa. Super. 2000).

Hower contends that Rogers' specific acts of negligence were that he left a needle inside her and refused to authorize an x-ray to find it and that he failed to inform her that a needle had broken during the surgical procedure. (Supplemental brief of plaintiff Mary Ann Hower in support of her motion to remove nonsuit pp. 6-7.) She advances three arguments in support of this contention.[2]

First, she cites the exception to the requirement of expert testimony in medical malpractice cases. No such testimony is needed "where the matter under investigation is *so simple,* and the lack of skill or want of care *so obvious,* as to be within the range of the ordinary experience and comprehension of even nonprofessional persons . . . ." *Lambert v. Soltis,* 422 Pa. 304, 308, 221 A.2d 173, 175 (1966). (emphasis in original)

Hower analogizes her case to "sponge cases," *i.e.,* cases where surgeons negligently leave a surgical sponge inside a patient, a situation of such obvious negligence that no expert testimony is required. In *Gregorio v. Zeluck,* 451 Pa. Super. 154, 678 A.2d 810 (1996), the court concluded that the defendant surgeon was negligent in fail-

---

2. Hower's three arguments focus on the first two alleged negligent acts; leaving a needle inside a patient and failure to order an x-ray. Our analysis follows the same focus. The "failure to inform" issue will be dealt with separately below.

ing to remove a sponge after surgery and this departure from medically accepted standards was "presumably" within the comprehension of ordinary lay jurors. *Id.* at 159, 678 A.2d at 813. Unlike the instant case, the plaintiffs in *Gregorio* presented a medical expert witness at trial; like the instant case they were nonsuited by the trial court whose decision was affirmed on appeal because the plaintiffs failed to prove a cognizable injury resulting from medical negligence nor could they prove a claim for negligent infliction of emotional distress. *Id.* at 161, 678 A.2d at 814-15. Why are "sponge cases" examples of medical malpractice so obvious that experts are not needed? Because a sponge is a foreign substance that cannot be tolerated by the body. See *Nogowski v. Alemo-Hammad,* 456 Pa. Super. 750, 761-62, 691 A.2d 950, 956 (1997). Can the same be said for a surgical steel needle tip?

No.

Dr. Pete Issac, the general surgeon who removed the needle tip, testified that surgeons often leave metal chips in a patient's fat tissue without adverse consequences. (N.T. 2/2/00 pp. 32-33.) In fact, Dr. Issac performed a cholecystomy on Hower and during the operation he used eight stainless steel or titanium hemoclips which remained permanently in Hower's body with no adverse effect or complaints from Hower. (N.T. 2/2/00 p. 53.) Therefore, even though a surgeon may leave a foreign object in a patient during surgery this is not ipso facto proof of the surgeon's negligence. Some foreign objects may be tolerated by the body, others may not. Therefore, we must take leave of the analogy to the sponge cases

and take a closer look at Rogers' alleged negligent act to determine if an expert was needed at this trial.

Rogers' alleged negligence consisted of three discrete decisions. First, he had to decide whether to continue searching for the needle tip after examining the operating field, the surgical drapes and operating room floor or close the incision. Second, he had to decide whether or not to use a portable x-ray in the operating room to locate the needle tip. Finally, he had to decide whether or not leaving the tip inside the patient would cause a health problem. (N.T. p. 241.) These decisions pose questions to the jurors who are being asked to determine if Rogers was negligent. For example, should Rogers have taken additional time to search for the needle tip before closing Hower's incision although this might increase the risk of infection? Despite its limitation, should he have used the portable x-ray in the operating room or sent Hower to the hospital's radiology department as soon as possible for a more accurate x-ray? Would a needle tip left embedded in Hower's fascia prove harmless and have no long-term effects on her health? We think that the answers to these questions are beyond the knowledge and experience of the ordinary layperson. The jurors' ability to answer these questions is crucial in a malpractice case because even in a case without an expert, the jury must still decide whether or not the defendant was negligent. Here, where they are asked to pass upon the professional judgments made by a medical specialist, jurors need guidance from an expert witness to determine if Rogers breached his duty to Hower and committed medical malpractice. Therefore, because she failed

to produce a necessary expert witness Hower did not prove a prima facie case of medical negligence against Rogers.

Our conclusion is supported by cases from other jurisdictions presented to us by Rogers, all of which hold that a plaintiff must present an expert witness to prove negligence where a surgeon exercises medical judgment and leaves a needle or scalpel tip in a patient's body. *Cebula v. Benoit,* 652 S.W.2d 304 (Mo. Ct. App. 1983); *Wayne v. Deborah Heart & Lung Center,* 588 A.2d 860 (N.J. Super..1991); *Williams v. Dameron,* 246 S.E.2d 586 (N.C. App. 1978); *John Hopkins Hospital v. Gendo,* 258 A.2d 595 (Md. 1969).

Hower next maintains that her case should have gone to the jury under the theory of res ipsa loquitur. Under this theory of liability, a jury may imply that the harm suffered by the plaintiff is caused by the defendant's negligence when:

"(a) the event is of the kind which ordinarily does not occur in the absence of negligence;

"(b) other responsible causes, including conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

"(c) the indicated negligence is within the scope of defendant's duty to the plaintiff." Restatement (Second) of Torts §328(D) (1965); *Hightower-Warren v. Silk,* 548 Pa. 459, 698 A.2d 52 (1997); *Kelly v. St. Mary Hospital,* 2001 Pa. Super. 175 (Pa. Super. 2001). All three of the above elements must be satisfied before an inference of negligence can be drawn from an injurious event. *Leone v. Thomas,* 428 Pa. Super. 217, 630 A.2d 900 (1993).

The theory of res ipsa loquitur was first applied to medical malpractice cases in *Jones v. Harrisburg Polyclinic Hospital,* 496 Pa. 465, 437 A.2d 1134 (1981). Regarding the nature of the evidence to be produced in a medical malpractice case based upon res ipsa loquitur the Supreme Court said:

"We are satisfied that expert testimony should no longer be a per se requirement in proof of negligence in all cases of alleged medical malpractice. Expert medical testimony only becomes necessary when there is no fund of common knowledge from which laymen can reasonably draw the inference or conclusion of negligence. Even where there is no fund of common knowledge, the inference of negligence should be permitted where it can be established from expert medical testimony that such an event would not ordinarily occur absent negligence. Restated, section 328D provides two avenues to avoid the production of direct medical evidence of the facts establishing liability: one being the reliance upon common lay knowledge that the event would not have occurred without negligence, and the second, the reliance upon medical knowledge that the event would not have occurred without negligence." *Jones* at 472-73, 437 A.2d at 1138. (footnote omitted)

Here, Hower has failed to prove the first element of res ipsa loquitur. As described above, the facts of this case are not such that a jury could rely upon common lay knowledge and conclude that Hower's alleged injury would not have occurred without Rogers' negligence. We have decided that the issues here involve knowledge beyond the education and experience of the ordinary lay-

person. Hower could have proven the first element by presenting a medical expert who would testify that Hower's injuries more likely than not were caused by Rogers' negligence. *Leone, supra.* However, Hower failed to do so and the first element of res ipsa loquitur was not shown. Because one of the elements is missing, an inference of negligence cannot be drawn from Rogers' actions. *Smith v. City of Chester,* 357 Pa. Super. 24, 515 A.2d 303 (1986).

In a final attempt to present a case without an expert, Hower argues that Rogers violated hospital policy concerning broken needles.[3] At the time of Hower's operation, The Reading Hospital and Medical Center had a policy that prohibited a patient from being closed if a needle had broken during a surgical procedure and not been found. The procedure called for an x-ray to be taken of the patient under these circumstances. Rogers' refusal to order an x-ray was a violation of hospital protocol, says Hower, and proves that a deviation from accepted standards of medical care occurred. Hower likens this theory to negligence per se. (Supplemental brief of plaintiff Mary Ann Hower in support of her motion to remove nonsuit p. 8 n.4.)

Hower presents no Pennsylvania law in support of her proposition that a surgeon's violation of internal hospital procedures constitutes a breach of care a doctor owes to a patient. The violation of a statute may serve as the

---

3. Although Hower identified the "needle count policy" at trial (N.T. pp. 221-22 exhibit no. 13) and moved it into evidence (N.T. p. 244) the policy does not appear in the official set of exhibits prepared by the court reporter.

basis for a finding of negligence per se; this concept establishes both duty and breach of duty where an individual violates an applicable statute, ordinance or regulation designed to prevent a public harm. *J.E.J. v. Tri-County Big Brothers/Big Sisters,* 692 A.2d 582, 585 (Pa. Super. 1997); *Campo v. St. Luke's Hospital,* 755 A.2d 20 (Pa. Super. 2000). However, regulations promulgated by a hospital are not legislative enactments and therefore cannot be the basis for a finding of negligence per se. Although there are no Pennsylvania cases on point, this conclusion is supported by cases from other jurisdictions. *Law v. Camp,* 116 F. Supp.2d 295 (U.S. Dist. Conn. 2000); *Van Steensburg v. Lawrence & Memorial Hosp.,* 481 A.2d 750 (Conn. 1984); *Leal v. Hobbs,* 538 S.E.2d 89 (Ga. App. 2000); *Darling v. Charleston Community Memorial Hospital,* 211 N.E.2d 253 (Ill. 1965); *Williams v. St. Claire Medical Center,* 657 S.W.2d 590 (Ky. App. 1983). Because Hower has not made out a case of negligence per se against Rogers, her third and final reason for not providing any expert must be rejected.

Hower also maintains that Rogers deviated from the standard of care in failing to inform her after the C-section that the needle tip remained inside her body. Although Rogers was convinced in his own mind that the needle tip flew off the operating table and was not in his patient, the needle tip remained unaccounted for until Hower's IVP x-ray some time later. The question then becomes, should Rogers have told Hower after the surgery that there was a possibility that the needle remained in her abdomen? Again, the answer to this question requires the assistance of an expert to establish the rel-

evant standard of care or breach thereof. A surgeon's appropriate course of action in this situation is beyond the knowledge of the average layperson especially where, as here, there is no testimony that the delay in detecting and removing the needle tip caused or exacerbated Hower's injuries.

We conclude that Hower needed a medical expert to prove her case against Rogers. She did not produce one. Therefore she did not prove a prima facie case of medical negligence against Rogers and the nonsuit was correctly entered.

In a final attempt to save her case against Rogers from nonsuit, Hower argues that Rogers waived his right to seek a nonsuit because his counsel cross-examined Hower beyond the scope of direct examination and injected a defense into the case. A nonsuit may not be granted if the defendant had offered evidence during or after the plaintiff's case. The rule permits nonsuit before any evidence on behalf of the defendant has been introduced. *Harnish v. School District of Philadelphia,* 557 Pa. 160, 732 A.2d 596 (1999); Pa.R.C.P. 230.1.

Hower specifically refers the court to Rogers' counsel's cross-examination of Hower concerning her signing two consent forms marked as defense exhibits nos. 15 and 16. (N.T. pp. 134-37.) Counsel then used defense exhibits nos. 9 and 11 to refresh Hower's recollection. (N.T. pp. 137-39, 141-42.) Finally, counsel questioned Hower about a note allegedly generated as a result of a conversation between Hower and a representative of the Women's Clinic in September 1996 indicating Hower may have been aware of the presence of the needle tip in

her body before April 14, 1997. Hower denied knowledge of the note. (N.T. pp. 149-50.) These exhibits were not admitted into evidence nor shown to the jury.

The cross-examination and exhibits in question were presented to refresh Hower's recollection and rebut her direct testimony and did not exceed the scope of direct examination. No defense was interposed by Rogers. It must be kept in mind in this context that " ' ["][t]he rule that the scope of cross-examination may not properly exceed the scope of the direct is not applicable where a party to the action offers himself as a witness. He may be cross-examined freely as to any matter relevant and material to the issues.["] *Jess v. McMurray,* [394 Pa. 526, 527, 147 A.2d 420, 421 (1959)].['] *Geelen v. Pennsylvania Railroad Company,* 400 Pa. 240, 246, 161 A.2d 595, 599 (1960)." *Hollidaysburg Tax Collectors v. Hollidaysburg Area School District,* 660 A.2d 245, 247 (Pa. Commw. 1995). See Pa.R.E. 611(b). Therefore, Rogers did not waive his right to move for a nonsuit.[4]

Hower also maintains that The Reading Hospital and Medical Center should remain in the case because Rogers was the ostensible agent of the hospital.[5] The theory of ostensible agency was first applied to hospitals in *Capan*

---

4. Hower's claim against the Women's Clinic was based upon vicarious liability only and a failure to prove a prima facie case against Rogers likewise is a failure to prove a prima facie case against the Women's Clinic. See *Mamalis v. Atlas Van Lines Inc.,* 364 Pa. Super. 360, 528 A.2d 198 (1987).

5. The court granted a nonsuit as to defendant Ganas. (N.T. p. 337.) Hower cites no error in the granting of this nonsuit in either her motion to remove nonsuit or in her brief or supplemental brief in support of said motion. Hence this issue is waived. *Cucchi, supra.*

*v. Divine Providence Hospital,* 287 Pa. Super. 364, 430 A.2d 647 (1980). The court relied on Restatement (Second) of Torts §429 (1965) to provide an exception to the general rule that an employer is not liable for the torts committed by an independent contractor in his employ. As applied to hospital liability for the negligence of independent contractor physicians the court concluded that the doctor may be an agent of the hospital with respect to the patient based upon two factors. First, the changing role of the hospital in society creates a likelihood that patients will look to the institution rather than the individual physician for care. Second, the hospital may "hold out" the physician as its employee. This occurs when the hospital acts or omits to act in some way which leads the patient to a reasonable belief he is being treated by the hospital or one of its employees. *Capan* at 368, 430 A.2d at 648-49.

Hower's sole reference to ostensible agency is found at a footnote in her brief. (Supplemental brief of plaintiff Mary Ann Hower in support of her motion to remove nonsuit p. 3 n.1.) The references to trial testimony found there do not support Hower's position. She testified that her HMO told her to go to "Reading Hospital at Women's Clinic" and she treated at the clinic throughout her pregnancy having seen three or four of their doctors. (N.T. p. 52.) She was also informed that Rogers would substitute for Dr. Fehnel in the delivery of her child, because Dr. Fehnel was unavailable. (N.T. pp. 58-59.) She also testified to meeting Rogers one time before delivery. (N.T. pp. 59-60.) Hower also testified that she knew the Women's Clinic was "affiliated" with the hospital that

they "worked together" and "guessed" that the clinic was part of the hospital but didn't know. (N.T. pp. 83-84.) The proffered testimony fails the *Capan* test. Hower's testimony shows that she looked to individuals—Rogers, Fehnel—not the hospital for care. Not knowing the exact nature of the "affiliation" between the clinic and the hospital she has not shown that she had a reasonable belief that she was treated by the hospital or one of its employees. Because ostensible agency had not been shown, we granted the hospital's motion for nonsuit.

Therefore, for the reasons set forth above, we denied Hower's motion to remove nonsuit.